# STATE OF MICHIGAN

# COURT OF APPEALS

SYLVAN TOWNSHIP,

               Plaintiff-Appellant,

v

CITY OF CHELSEA and WASHTENAW
COUNTY,

               Defendants-Appellees.

FOR PUBLICATION
November 24, 2015
9:10 a.m.

No. 323663
Washtenaw Circuit Court
LC No. 14-000213-CZ

Before: GADOLA, P.J., and HOEKSTRA and M. J. KELLY, JJ.

PER CURIAM.

In this dispute over the obligation to repay debt on municipal bonds, plaintiff, Sylvan Township (Sylvan), appeals by right the trial court's order granting the motion for summary disposition by defendant, City of Chelsea (Chelsea). On appeal, Sylvan argues that the trial court erred when it applied the doctrines of res judicata and equitable estoppel to bar its claim that Chelsea was obligated to pay a share of the municipal debt incurred by Sylvan before Chelsea incorporated as a home rule city. Because we agree that the trial court erred when it dismissed Sylvan's claim on the grounds that it was barred by res judicata and equitable estoppel, we reverse and remand.

## I. BASIC FACTS

In September 2000, several qualified electors petitioned the State Boundary Commission (the Commission) to consider the incorporation of Chelsea as a home rule city. Chelsea was a village at the time. The petitioners' proposed boundaries for the city included all the territory of the village and some territory from Sylvan and Lima Townships. Beginning in March 2001, Sylvan opposed Chelsea's petition to incorporate before the Commission and in Ingham Circuit Court.

As part of agreements with developers, Sylvan decided to create a special assessment district for the construction of water and sewerage systems. It originally proposed the creation of a modest sewerage system that would serve the developers' developments alone. The special assessment district was specifically created to pay for a waste water treatment plant in the township. However, at some point, Sylvan abandoned its plan to construct its own waste water treatment plant and instead entered into an agreement to connect with a neighboring township's

-1-

system using an interceptor line. The new project was more expensive than originally proposed. Sylvan did not pursue a new or revised special assessment to pay for the altered project.

In July 2001, Sylvan entered into agreements with Washtenaw County for the issuance of $12.5 million in bonds to cover the construction of the water and sewerage systems for the township. In the agreements, the parties noted that Sylvan had made special assessments that would become due in December 2002 and be collected through December 2021. In a statement on the proposed bonds issued in September 2001, it was stated that Sylvan intended to "defray" its payments to the county "through a combination of special assessments, connection fees and user charges." The interest payments on the bonds were to be made in May and November of each year and were to commence in November 2001.

In October 2001, representatives from Chelsea, Sylvan, Lima Township, and a representative of the petitioners for incorporation entered into a joint settlement agreement. As part of the settlement, Chelsea agreed that it would annex less territory from Sylvan and Sylvan agreed to no longer oppose the incorporation of Chelsea as a home rule city.

In May 2002, after holding adjudicative hearings, the Commission recommended approval of the petition, which would allow a vote on whether Chelsea should be incorporated as a city through the adoption of a charter. The Director of the Department of Consumer & Industry Services adopted the Commission's recommendation and findings in June 2002. Chelsea held an election on the adoption of a charter for the proposed city in March 2004, and a majority of the voters voted for the charter. Accordingly, the village and the specified areas from the adjacent townships became the City of Chelsea at that time.

Sylvan's water and sewerage systems were operating on some level by November 2002. See *NDC of Sylvan, Ltd v Township of Sylvan*, unpublished opinion per curiam of the Court of Appeals, issued May 19, 2011 (Docket Nos. 301397 & 301410). In 2003 and 2004, Sylvan began to have disputes with the developers with whom it had agreed to establish special assessment districts to cover in part the costs of the water and waste water systems. *Id.* The developers sued Sylvan on various grounds in 2007 and, in April 2010, the trial court issued an opinion and order in which it determined that the special assessments for the sewerage system were invalid. *Id.* The trial court enjoined Sylvan from collecting the unlawful special assessments against the developers. On appeal, this Court affirmed the trial court's decision in relevant part. *Id.*

In 2010, Sylvan asked Washtenaw County to approve refunding bonds as a way of refinancing Sylvan's obligations to the county. The county agreed and issued the refunding bonds in March 2010. The statement concerning the refunding bonds showed that the county was refunding $9.4 million of the original bonds. Sylvan tried to get the electors to approve a property tax increase to cover the payments on the refunding bonds, but the measure failed.

In May 2012, Sylvan defaulted in its payments of the refunded bonds.

In July 2012, Sylvan entered into a new agreement with Washtenaw County. In the new agreement, the parties acknowledged that the special assessments had been invalidated and that Sylvan had been unable to get its electors to approve a millage to cover the refunded bonds. The

parties agreed that the county would continue to advance funds to cover Sylvan's obligations, but made that agreement contingent on Sylvan's electors' approval of a proposed millage increase. They further agreed that, if the millage passed, Sylvan would use any taxes collected on the new millage to repay the funds advanced by the county and service the debt on the refunded bonds.

In October 2012, Sylvan's lawyer sent a letter to Chelsea's City Manager concerning Sylvan's bond obligations. In the letter, Sylvan asserted that, because Chelsea "took" approximately 41% of Sylvan's assessed value when it incorporated as a city, under the Home Rule City Act, Chelsea assumed 41% of Sylvan's liability under the bonds. Sylvan invited Chelsea to engage in "further dialogue" on the matter to reach a "consensus as to the amount of [Chelsea's] contribution" to the shared obligation. Chelsea disagreed that it had assumed any liability under the bonds.

In March 2014, Sylvan sued Chelsea for declaratory relief. It alleged that, under MCL 117.14, Chelsea assumed a proportionate share of Sylvan's liabilities when it became a city, which included a share of Sylvan's liability for the repayment of the bond debt incurred to construct improvements for the treatment of waste water. Sylvan asked the trial court to declare that Chelsea is liable for a proportionate share of Sylvan's liabilities under the bond contracts, must reimburse Sylvan for Chelsea's share of the debt already paid by Sylvan, and is obligated to pay its share of all future payments on the bonds as they come due. Sylvan amended its complaint in April 2014 to include Washtenaw County as a defendant.

In August 2014, Chelsea moved for summary disposition under MCR 2.116(C)(7) and (C)(8). Chelsea argued, in relevant part, that Sylvan specifically waived any right to contribution that it might have had when it settled its dispute over Chelsea's petition to incorporate. Chelsea further maintained that Sylvan's claim was barred under the doctrine of res judicata because Sylvan raised the issue with the Commission and the Commission did not require Chelsea to assume any portion of Sylvan's liabilities as part of its decision. Chelsea also argued that Sylvan had to assert its right to a division of liabilities under MCL 117.14 at the time of the city's incorporation and failed to do so. For that reason, Chelsea asserted, Sylvan's complaint for declaratory relief was untimely. Chelsea similarly argued that Sylvan unduly delayed asserting its claim, which prejudiced Chelsea, and engaged in inequitable conduct that warranted barring the claim under the doctrines of laches and equitable estoppel.

The trial court held a hearing on the motion in August 2014. After the parties presented their arguments, the trial court granted Chelsea's motion. Citing the decision by the Commission arising from the dispute over incorporation, the court stated that Sylvan's claim was barred by the doctrine of res judicata. The court also determined that Sylvan's claim was barred on equitable grounds:

> [T]he Township knew of the existence of this potential liability to the County . . . and chose not to assert that [claim] at the time of [] the incorporation issue being before the Boundary Commission and the public. Subsequently, the Township Board and not the City made intentional and unlawful decisions that caused the default on those bonds. . . . [I]t was never intended by anyone that the City residents would receive any benefit from . . . the proposed construction that was to [take] place on these bonds. Nor did . . . the City residents receive any

-3-

benefit . . . . Subsequently, the Township represented to its own citizens at a millage election that the Township, not the City and the Township, that the Township was responsible for the entire 12 plus million dollars owed on the default of these bonds to the County and convinced the electorate to pass a millage not voted on by the people of Chelsea but voted on by the people of Sylvan Township to assume that debt and entered into an agreement with the County so that that debt could be paid off over a period of time rather than immediately . . . . Under all . . . those circumstances I do find that the Township is equitably estopped from making a claim against the City residents now . . . .

Later that same month, the trial court entered an order granting Chelsea's motion for summary disposition for the reasons stated on the record and dismissing Sylvan's claim with prejudice.

Sylvan now appeals in this Court.

## II. SUMMARY DISPOSITION

### A. STANDARDS OF REVIEW

Sylvan argues on appeal that the trial court erred when it granted Chelsea's motion for summary disposition; specifically, it maintains that the trial court erred when it applied res judicata and equitable estoppel to bar its claim. In considering Chelsea's motion for summary disposition, it appears that the trial court relied on evidence outside the pleadings—including its own familiarity with the case. Accordingly, we shall treat the trial court's decision as though made under MCR 2.116(C)(10). See *Kefgen v Davidson*, 241 Mich App 611, 616; 617 NW2d 351 (2000).

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Barnard Mfg Co, Inc v Gates Performance Eng, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009). This Court reviews de novo the trial court's application of legal and equitable doctrines, such as the doctrines of res judicata and equitable estoppel. *Washington v Sinai Hosp of Greater Detroit*, 478 Mich 412, 417; 733 NW2d 755 (2007); *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008). "This Court also reviews de novo whether the trial court properly selected, interpreted, and applied the relevant statutes." *Kincaid v Cardwell*, 300 Mich App 513, 522; 834 NW2d 122 (2013). Finally, this Court reviews de novo the proper construction of contractual agreements. *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005).

### B. RES JUDICATA

The trial court determined that the doctrine of res judicata barred Sylvan's claim because the claim was or could have been resolved in the litigation involving the boundary dispute.

The judiciary created the doctrine of res judicata to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Pierson Sand and Gravel, Inc v Keeler Brass Co*, 460 Mich 372, 380; 596 NW2d 153

-4-

(1999) (quotation marks and citations omitted). To that end, a second action will be barred under res judicata "when (1) the first action was decided on the merits, (2) the matter contested in the second action was or could have been resolved in the first, and (3) both actions involve the same parties or their privies." *Dart v Dart*, 460 Mich 573, 586; 597 NW2d 82 (1999). [*Green v Ziegelman*, ___ Mich App ___, ___; ___ NW2d ___ (2015) (Docket No. 318989); slip op at 4.]

The Legislature established the state boundary commission and delegated to it the authority to approve incorporations and annexations. See *Shelby Charter Twp v State Boundary Comm*, 425 Mich 50, 58; 387 NW2d 792 (1986). The Legislature required the Commission to review all petitions and resolutions for the incorporation of cities or the annexation of territory. See MCL 123.1007(3); MCL 117.9(2). To that end, the Commission must determine whether the petition conforms to the requirements of the Home Rule City Act. See MCL 123.1008(2); MCL 117.9(2). The Commission is also required to conduct a hearing to review whether the proposed incorporation is reasonable. MCL 123.1008(1) and (3). After the hearing, the Commission may deny or approve the petition, or approve the petition with revisions. MCL 123.1010(1). If the Commission denies the petition, the order is final. MCL 123.1010(2). If the Commission approves the petition and the petition becomes final, as described by statute, the electors must then follow the procedures for the creation of a charter commission. See MCL 123.1010(3) to (6); MCL 117.15. The proposed city becomes incorporated when the electors adopt a charter for the city. MCL 117.17. If the electors do not adopt a charter within 3 years of the Commission's final order of approval, the incorporation proceedings end. MCL 123.1010(6).

The Commission has broad authority to reject or approve a proposed incorporation. See *Casco Twp v State Boundary Comm*, 243 Mich App 392, 397-398; 622 NW2d 332 (2000). And, when determining whether a proposed incorporation is reasonable, the Commission may plainly consider the effect that the proposed incorporation will have on the financial obligations of the communities affected by the proposal. See MCL 123.1009. But it is equally clear that the Legislature did not give the Commission the general authority to resolve disputes concerning the succession to property or liabilities that might be occasioned by the incorporation of a new city; indeed, it provided that the "[s]uccession to property and liabilities, division of properties, sharing in revenue from various taxes and state funds distributable among local units and assessment and collection of taxes in newly incorporated municipalities shall be governed by the existing provisions of law." MCL 123.1011. The reference to existing provisions of law encompasses MCL 117.14. It is also noteworthy that the Legislature made MCL 117.14 inapplicable when a city annexes a part of a village or township, except in limited circumstances, and when it does apply to annexations, the Legislature empowered the Commission to determine an equitable division of assets and liabilities. See MCL 117.9(9). By giving the Commission the authority to make an equitable division under a limited set of circumstances and providing that the division of assets and liabilities is otherwise governed by existing law, the Legislature impliedly limited the Commission's authority to resolve disputes arising from the incorporation of a new city. As Sylvan states on appeal, it would also be impractical for the Commission to address the division of assets and assumption of liabilities for newly incorporated cities because the electors could adopt a charter up to three years after the Commission's final decision. MCL 123.1010(6). During that time, there may be new liabilities or changes in circumstances that would alter the equities applicable to the division of property or the assumption of liabilities.

-5-

The Commission had no authority to make an equitable division of the assets or determine liabilities as provided under MCL 117.14 arising from Chelsea's incorporation as a city. Because the parties could not have resolved the issues involved in this suit before the Commission or in the related litigation concerning the Commission's actions, the trial court erred as a matter of law when it applied res judicata to bar Sylvan's claim. *Dart*, 460 Mich at 586.

## C. EQUITABLE ESTOPPEL

The trial court also determined that Sylvan's acts and representations equitably estopped it from now claiming that Chelsea is partially liable on the bonds. The doctrine of equitable estoppel has its origins in the prevention of fraud:

> It has its origin in moral duty and public policy; and its chief purpose is the promotion of common honesty, and the prevention of fraud. Where a fact has been asserted, or an admission made, through which an advantage has been derived from another, or upon the faith of which another has been induced to act to his prejudice, so that a denial of such assertion or admission would be a breach of good faith, the law precludes the party from repudiating such representation, or afterwards denying the truth of such admission. [*Hassberger v Gen Builders' Supply Co*, 213 Mich 489, 492-493; 182 NW 27 (1921) (quotation marks and citation omitted).]

In order to establish that Sylvan's claim should be barred under the doctrine of equitable estoppel, Chelsea had to present evidence that Sylvan's acts or representations induced Chelsea to believe that Sylvan would not enforce its rights under MCL 117.14, that Chelsea relied on this belief, and that Chelsea was prejudiced as a result of its reliance. See *McDonald*, 480 Mich at 204-205.

As Sylvan correctly points out on appeal, Chelsea did not present any evidence to support an inference that Sylvan—either by representations or acts—induced Chelsea to believe that it would not assert its rights under MCL 117.14. Chelsea also did not present any evidence that it relied to its detriment on a belief that Sylvan would not assert its right to have Chelsea pay its share of the liabilities Sylvan incurred before Chelsea incorporated as a home rule city. Indeed, Chelsea's argument for equitable estoppel centered on its belief that Sylvan affirmatively waived its rights under MCL 117.14 when it entered into the agreement settling the dispute before the boundary Commission and the related lawsuit, and on the fact that Sylvan did not earlier assert its rights. As will be discussed below, Sylvan did not affirmatively waive its rights under MCL 117.14 in the settlement agreement and, for that reason, the agreement could not have induced Chelsea to believe that Sylvan would not assert its rights. In addition, although a party may induce reliance through silence, equitable estoppel will only arise from silence under circumstances where the party to be estopped ought to speak out in order to prevent prejudice to the party relying on the silence. See *Lichon v American Ins Co*, 435 Mich 408, 415; 459 NW2d 288 (1990) (stating that equitable estoppel might arise from silence where the party to be estopped ought to have spoken out); *Prout v Wiley*, 28 Mich 164, 167 (1873) (stating that equitable estoppel by silence may apply to a case involving a deed where the party stands by and watches the other party improve the property, or expend money, or sell the property to another without asserting the claim). Here, there was no evidence that Sylvan stood by and neglected its

rights under MCL 117.14 while Chelsea changed its position in reliance on Sylvan's silence. In the absence of such evidence, the trial court should have denied Chelsea's motion to the extent that it argued that Sylvan's claim was barred by equitable estoppel.

The trial court also erred to the extent that it applied equitable estoppel on the basis of evidence that was not in the record. It appears from the trial court's statements after oral arguments that it applied equitable estoppel in part because it felt that Sylvan engaged in misconduct that created the problems giving rise to Sylvan's inability to meet its bond obligations. That is, it appears that the trial court found that it would be inequitable to require Chelsea to assume a portion of a debt when Sylvan's misconduct created the circumstances that made it necessary for Sylvan to pay the liabilities from its general fund and raise taxes. The trial court's belief that Sylvan should alone bear the burdens of its misconduct does not implicate equitable estoppel absent evidence that the purported misconduct led Chelsea to believe that Sylvan would not assert it rights and that Chelsea reasonably relied on the belief to its detriment. *McDonald*, 480 Mich at 204-205. There is no evidence that Sylvan's handling of the dispute with the developers caused Chelsea to believe that Sylvan would not assert its rights under MCL 117.14 or that Chelsea relied on such a belief to its prejudice. Therefore, on this record, we conclude that the trial court erred when it applied equitable estoppel to bar Sylvan's claim.

### D. WAIVER

On appeal, Sylvan argues that a plain reading of the settlement agreement demonstrates that it did not waive its rights under MCL 117.14 in that agreement. It further argues that the trial court should have granted its request for summary disposition in its favor on that defense.

In the settlement agreement, Sylvan and Chelsea (along with the other parties) stated that the agreement related to "the proposed boundaries of the area proposed to be incorporated as a Home Rule City" by Chelsea. They then agreed that the proposed city would include boundaries with "the limited area" depicted in an attached exhibit. In consideration of the agreement, Sylvan waived its "objections to the legal sufficiency of the Petition in this matter" and agreed that it would not "reassert any of the claims originally set forth" in the complaint that Sylvan filed in Ingham Circuit Court concerning the Commission's approval of the petition. Chelsea and Sylvan also agreed that neither party waived "any claims or arguments, positions or rights," "except as to this Commission Docket and except as set forth in paragraph 3 . . . ."

Sylvan did not voluntarily and intentionally abandon its right to enforce MCL 117.14 in this agreement. See *Quality Products and Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 374; 666 NW2d 251 (2003). The waiver provision stated in paragraph 3 applied to Sylvan's right to object to the sufficiency of the petition and petition process. Even reading the waiver in paragraph 3 together with paragraph 6, which referred to the claims or arguments raised in "this Commission Docket," Sylvan cannot be said to have waived its right to raise a claim that Chelsea assumed a portion of its liabilities. Although Sylvan informed the Commission about the debt that Sylvan incurred in constructing its water and sewerage improvements, it did not raise that issue in the context of a division of assets or the assumption of liabilities under MCL 117.14. Instead, it raised that issue as a factor for consideration by the Commission when exercising its discretion to approve the petition. See MCL 123.1009. Therefore, to the extent that Sylvan waived anything as a result of bringing that issue up in the "Commission Docket," it

waived the right to challenge the petition on the grounds that Chelsea's incorporation would adversely affect Sylvan's ability to meet its bond obligations. Similarly, a review of Sylvan's complaint in Ingham Circuit Court shows that Sylvan challenged the validity of the petition to incorporate Chelsea as a home rule city. At no point in its petition for interlocutory review did Sylvan raise a claim or dispute concerning the division of assets or assumption of liabilities that might be occasioned by the incorporation.

Because Sylvan did not waive its right to enforce MCL 117.14 in the settlement agreement, the trial court should have granted Sylvan's request for summary disposition on this defense.

## E. LACHES AND THE PERIOD OF LIMITATIONS

Sylvan also argues on appeal that the trial court erred when it refused to dismiss Chelsea's defenses premised on the period of limitations and laches. More to the point, Sylvan argues that its claim is plainly timely because it sued within months after it first had to make a payment from its general fund. Chelsea counters that Sylvan's claim is plainly untimely because it comes years after Chelsea incorporated as a city.

Sylvan's claim for declaratory relief depends on the nature of the claim underlying its request for relief. See *New Products Corp v Harbor Shores BHBT Land Dev, LLC*, 308 Mich App 638, 646; 866 NW2d 850 (2014). The Legislature did not provide any specific procedure for effecting the assumption of liabilities under MCL 117.14. The statute merely provides that, for a new city, the liabilities "shall be . . . assumed" by the new city effective "as of the date of filing the certified copy of the charter" and using "the same ratio" provided for cases where a city annexes a portion of a township. MCL 117.14. Because the new city apparently assumes its share of the township's liabilities by operation of law, the township has no obligation to take steps to formalize the assumption of liability by the newly formed city; the township may rely on MCL 117.14 and require the new city to meet its share of the township's obligations as those obligations come due. See *Twp of Dearborn v City of Dearborn*, 308 Mich 284, 293-294; 13 NW2d 821 (1944).[1]

Chelsea filed its charter in March 2004, and it assumed by operation of law a proportional share of Sylvan's liabilities, as those liabilities existed on that date. Sylvan now seeks to compel Chelsea to meet its obligation to pay its share of Sylvan's liability on the bonds at issue. In particular, Sylvan asked the trial court to order Chelsea to compensate Sylvan for that portion of the debt on the bonds at issue that should have been paid by Chelsea, which Sylvan already paid, and to apportion liability for the remaining debt on the bonds. Chelsea responded, in relevant

---

[1] It should be noted that Sylvan's creditors may not rely on the statutory assumption of liability to compel payment directly from Chelsea. See *Turnbull v Bd of Educ*, 45 Mich 496, 499; 8 NW 65 (1881) ("A debt once existing must remain a debt against the corporation that created it, and its obligation is not destroyed by a change in corporate limits. If contribution is required, it must be obtained by the corporation and not by its creditors, unless otherwise provided by law.").

part, by arguing that Sylvan engaged in conduct that makes it inequitable for the trial court to apportion any of Sylvan's liabilities to Chelsea.

Sylvan's claim is in the nature of an equitable action for an accounting or contribution, which requires the consideration and adjustment of rights among various parties. See *Tkachik v Mandeville*, 487 Mich 38, 47; 790 NW2d 260 (2010) (discussing the nature of the equitable doctrine of contribution); *Haylor v Grigg-Hanna Lumber & Box Co*, 287 Mich 127, 133; 283 NW 1 (1938) ("A resort to equity is necessary whenever complete and adequate relief requires an adjustment of diverse rights among the parties, as in adjusting liens, distributing funds and in matters of account."). Nevertheless, a claim for contribution under MCL 117.14 does not fit within the traditional framework applied to an action for contribution by joint tort-feasors; the traditional claim involves two or more tort-feasors who caused an injury that resulted in an enforceable judgment. See MCL 600.2925c. Consequently, MCL 600.2925c does not on its face apply to a claim for contribution under MCL 117.14; because no specific period of limitations encompasses an action to enforce MCL 117.14, we conclude that the six-year period of limitations provided under MCL 600.5813 applies.

On appeal, Sylvan argues that the accrual date for its claim should be the same as the accrual for a claim of contribution by a joint tortfeasor, citing *Sziber v Stout*, 419 Mich 514, 533-534; 358 NW2d 330 (1984) (stating that a claim of contribution accrues when a judgment has been rendered and the plaintiff has paid more than his or her aliquot share). Inasmuch as Chelsea assumed the liabilities by operation of law, it seems inapt to require a judgment and an over payment on the judgment. Rather, any claim that Sylvan had against Chelsea for an accounting of the debts and liabilities accrued when Chelsea first failed to pay its share of the assumed liability, without regard to whether Sylvan itself paid Chelsea's share. See MCL 600.5827. To the extent that Sylvan incurred new or additional liabilities related to the bonds after the date of Chelsea's incorporation (such as by increasing the obligations through misconduct), Chelsea did not assume any portion of the new or additional debt. See *Twp of Dearborn*, 308 Mich at 290.

As this Court has recognized, there may be fact questions that must be resolved in order to determine when a claim accrued. See *Kincaid*, 300 Mich App at 523. In this case, the trial court did not grant Chelsea's motion for summary disposition on the grounds that it was time-barred and the parties did not develop the record sufficiently to identify the applicable accrual date as a matter of law. It is unclear whether and when Chelsea might have become obligated to make a payment on the shared liability (assuming there to be a shared liability). For example, Sylvan's agreement with the county provides that the township will pay principal and interest on the bonds without regard to the source of the funds used to make the payments. Stated another way, the obligation appears to be absolute—it does not apparently depend on whether there are special assessments. Thus, Chelsea might have been obligated to pay its share of the payments immediately after it incorporated, notwithstanding that there were special assessments available to Sylvan to make the payments. For that reason, Sylvan's failure to assert its rights under MCL 117.14 might be time-barred as to the earlier payments. But see *Dearborn Twp*, 308 Mich at 295-296 (noting that the right to have contribution does not arise until a contingent liability becomes a fixed liability). It is also unclear how the refunding of the bonds might have affected the nature and extent of the liability at issue. Because the parties did not adequately address these issues and did not have occasion to develop the record concerning the timing and nature of

the required payments, we decline to further address whether and to what extent Sylvan's claim might be barred under the applicable period of limitations.

For similar reasons, we decline to consider whether laches might properly apply to bar Sylvan's claim in whole or in part; as we have explained, the primary inquiry when applying the doctrine of laches is whether the plaintiff's failure to earlier assert his or her claim prejudiced the defendant:

> Although considerations of timing are important when determining whether laches applies to the facts, laches is not triggered by the passage of time alone. Laches is an equitable tool used to provide a remedy for the inconvenience resulting from the plaintiff's delay in asserting a legal right that was practicable to assert. As such, when considering whether a plaintiff is chargeable with laches, we must afford attention to prejudice occasioned by the delay. It is the prejudice occasioned by the delay that justifies the application of laches. [*Knight v Northpointe Bank*, 300 Mich App 109, 114-115; 832 NW2d 439 (2013) (quotation marks and citations omitted).]

In order to determine whether Chelsea suffered prejudice as a result of Sylvan's delay, it is essential to determine when it was practicable for Sylvan to assert its claim. Sylvan argues that it was not practicable until it became necessary for Sylvan to refinance the bonds and raise taxes to cover the expenses. But that assertion may be incorrect. If Chelsea had an obligation to pay its share earlier—perhaps years earlier—and Sylvan failed to assert its rights, the trial court might reasonably conclude that Sylvan should be charged with laches if the delay prejudiced Chelsea's rights. For example, had Sylvan earlier asserted its rights under MCL 117.14, Chelsea might have been able to intervene in a way that prevented Sylvan from jeopardizing the special assessments or might have been able to otherwise take actions to limit its exposure to liability. On this record, we cannot determine when it was practicable for Sylvan to assert its rights or determine whether Chelsea suffered prejudice warranting the application of laches.

The trial court did not err to the extent that it refused to dismiss Chelsea's defenses premised on the period of limitations or the doctrine of laches.

## F. ALTERNATE RELIEF

Chelsea argues on appeal that, by referring to territory that is "taken from" a township, the Legislature intended the division of assets and liabilities to apply only to the annexation of territory from a township, which necessarily does not include territory within a neighboring village; namely, Chelsea asks this Court to distinguish between territory held by a particular municipality and land subject to taxation by multiple municipalities. Accordingly, Chelsea asks this Court to dismiss Sylvan's claim "for a declaration that Chelsea owes a share of liability for any territory that once comprised the Village of Chelsea" under MCR 2.116(C)(8). In its reply, Sylvan argues that this Court should not consider the issue because Chelsea did not raise it in a cross-appeal and the issue involves the extent of Chelsea's share of the liability rather than whether it has any liability at all.

Although Chelsea raised this issue in its motion for summary disposition, the trial court did not address it, and it does not provide an independent basis for affirming the trial court's decision; therefore, Sylvan is probably correct when it argues that this issue should have been raised by cross-appeal. See *In re Herbach Estate,* 230 Mich App 276, 283-284; 583 NW2d 541 (1998). Nevertheless, there is nothing to prevent Chelsea from raising this issue on remand and nothing to prevent the parties from challenging the trial court's resolution of the issue in a subsequent appeal. Because the parties have addressed this issue on appeal and it is one of law that this Court can decide on the existing record, in the interests of efficiency, we elect to exercise our discretion to provide further or different relief, as the case may require, and consider this issue. See MCR 7.216(A)(7).

## 1. THE GOVERNING MUNICIPAL LAW

In addition to the provisions for counties, Michigan's Constitution recognizes three types of local government: townships, villages, and cities. See Const 1963, art 7, § 14 (giving counties the power to organize and consolidate townships); Const 1963, art 7, § 17 (providing that townships are a body corporate); Const 1963, art 7, § 21 (stating that the Legislature must provide by general laws for the incorporation of cities and villages). These entities are often referred to as municipal corporations. See *City of Roosevelt Park v Norton Twp*, 330 Mich 270, 273; 47 NW2d 605 (1951) (noting that a township is a municipal corporation); *Maple Grove Twp v Misteguay Creek Intercounty Drain Bd*, 298 Mich App 200, 210-213; 828 NW2d 459 (2012) (interpreting statutory provisions that refer to cities, villages, and townships as municipalities). The Constitution gives the Legislature the authority to establish laws governing the creation, annexation, dissolution, and interaction of local units of government. See Const 1963, art 7, § 21. The issues in this case involve all three types of municipalities.

Chelsea was established as a village in the nineteenth century. See *Wilkinson v Conaty*, 65 Mich 614, 615; 32 NW 841 (1887) (noting that the real property at issue was part of the original plat of the village of Chelsea and that its owner mortgaged the land in 1867). In 1909, Michigan's Legislature enacted parallel acts governing home rule villages, see 1909 PA 278, and home rule cities, see 1909 PA 279. The Home Rule Village Act, see MCL 78.1 *et seq.*, and the Home Rule City Act, see MCL 117.1 *et seq.*, as they have been amended over time, generally govern villages and cities chartered after 1909. However, because Chelsea existed as a village before 1909, Chelsea continued its corporate character as a village under the general law village act, MCL 61.1 *et seq.*, which remains in force. See MCL 78.1(2); see also MCL 74.7 (stating that villages incorporated before February 1895 are reincorporated automatically under, and made subject to, the general village act). When Chelsea became a city, it did so under the Home Rule City Act.

## 2. THE DIVISION OF ASSETS AND LIABILITIES

The adjustment of property and liabilities arising from the alteration of municipal boundaries historically involved only townships and cities. See MCL 123.1. This was because the Legislature treated villages as component parts of townships. See MCL 123.9 (stating that the act will apply to a village when "it shall not be a part of any township"). However, after the enactment of the Home Rule City Act and the Home Rule Village Act, the Legislature specifically addressed the adjustment of rights and liabilities involving the alteration of territorial

boundaries for all three types of municipalities. See MCL 78.10 (providing for the division of property and the assumption of liabilities involving the annexation of territory by a village from a township, village, or city); MCL 117.14 (regulating the division of property and the assumption of liabilities involving the annexation of territory by a city from a township, village, or city). And, when either the Home Rule City Act or the Home Rule Village Act applies, it is error for a trial court to adjust the rights and liabilities of the affected municipalities using MCL 123.1. See *Twp of Dearborn*, 308 Mich at 289-290.

Sylvan relies on MCL 117.14, which is part of the Home Rule City Act, for the proposition that Chelsea assumed a portion of its liability on the bonds at issue when it incorporated as a city. MCL 117.14, which is structured as one continuous section, addresses the different ways in which territory might be transferred from one municipal entity to another and prescribes rules for the disposition of real property, personal property, and liabilities affected by the transfer.

The Legislature first addressed those territorial transfers to a city from another municipality where the city acquires ownership of all of the municipality's property and assumes all of the municipality's liabilities:

> Whenever an incorporated village is incorporated as a city, without change of boundaries, such city shall succeed to the ownership of all the property of such village and shall assume all of its debts and liabilities. Whenever a city, village or township is annexed to a city, the city to which it is annexed shall succeed to the ownership of all the property of the city, village or township annexed, and shall assume all of its debts and liabilities. [MCL 117.14.]

Thus, the statute contemplates that a city will succeed to all of an existing municipality's property and liabilities in two situations: when a new city is formed from a village and the boundaries remain the same, and when an existing city annexes an entire municipality.

The statutory scheme then turns to situations where an existing city annexes part—but not all—of another municipality. When the annexed territory includes real property, which is owned by the municipality that is losing the territory, the municipality that owns the property must sell it and divide the proceeds with the city annexing the territory:

> Whenever a part of a city, village or township is annexed to a city, the real property in the territory annexed which belongs to the city, village or township from which it is taken shall be sold by the authorities of the city, village or township in which said land was located before such annexation, and that portion of the proceeds of such sale shall be paid to the city acquiring such territory which shall be in the same ratio to the whole amount received as the assessed valuation of the taxable property in the territory annexed bears to the assessed valuation of the taxable property in the entire city, village or township from which said territory is taken. [MCL 117.14.]

The Legislature provided a similar scheme for the division of personal property, except that the division of personal property applies to all of the personal property owned by the municipality that is losing the territory without regard to the location of the personal property:

Whenever a part of a city, village or township is annexed to a city, all of the personal property belonging to any such city, village or township from which territory is detached shall be divided between the township, city or village from which said territory is detached and the city to which the territory is annexed, in the same ratio as the assessed valuation of the taxable property in the territory annexed bears to the assessed valuation of the taxable property in the entire city, village or township from which said territory is taken. [MCL 117.14.]

Likewise, the Legislature provided that the city annexing territory from another municipality must assume a portion of the liabilities of the municipality losing the territory:

The indebtedness and liabilities of every city, village and township, a part of which shall be annexed to a city shall be assumed by the city to which the same is annexed in the same proportion which the assessed valuation of the taxable property in the territory annexed bears to the assessed valuation of the taxable property in the entire city, village or township from which such territory is taken. Assessed valuation shall be determined in every division pursuant to this section from the last assessment roll of the city, village or township which has been confirmed by the board of review. [MCL 117.14.]

The Legislature also addressed a situation involving the creation of a new city from a township:

Whenever a new city shall be incorporated, the personal property of the township from which it is taken shall be divided and its liabilities assumed between such city and the portion of the township remaining after such incorporation, which incorporation shall be effective as of the date of filing the certified copy of the charter as hereinafter provided, in the same ratio as herein provided in case of the annexation of a part of a township to a city . . . . [MCL 117.14.]

Because Chelsea incorporated as a new city and the new city included territory beyond the village's existing boundaries, Sylvan argues that the last quoted sentence governs the division of assets and liabilities for this case. In making this argument below, Sylvan maintained that Chelsea assumed a proportion of Sylvan's indebtedness and liabilities equal to the proportion of the assessed value of that portion of the township annexed by the new city as well as that portion of the village of Chelsea that was in Sylvan. Using this area to determine the valuation of the taxable property, Sylvan maintains that Chelsea assumed approximately 41% of Sylvan's debts and liabilities on the day that the electors adopted Chelsea's city charter.

## 3. SHARE OF LIABILITY

The Legislature provided that, when a village incorporates into a city without changing its boundaries, the new city succeeds to the ownership "of all the property of such village" and assumes "all of its debts and liabilities." MCL 117.14. Notably, the Legislature did not

specifically address whether the new city would also assume a portion of the liabilities of any township that has the authority to levy taxes on property within the village. Rather, throughout MCL 117.14, the Legislature apparently distinguished between territory within a particular municipal boundary—a township, village, or city—and territory subject to assessment; the Legislature essentially placed villages on the same footing as any other type of municipality. The Legislature used the term "territory" in the same way in the analogous provisions in the Home Rule Village Act, which the Legislature adopted contemporaneously with the Home Rule City Act. A village may annex territory in much the same manner as a city. See MCL 78.2. And, when a village annexes territory from a township, the village acquires property and assumes liabilities from the township in the same way that a city does when it annexes territory from a township. See MCL 78.10. Because a village that annexes territory from a township assumes the liabilities of the township in "the same proportion which the assessed valuation of the taxable property in the territory annexed bears to the assessed valuation of the taxable property in the entire city, village or township from which such territory is taken," MCL 78.10, it stands to reason that the Legislature understood that the village's territory is distinct from the territory held by the township, even if the township has the authority to levy taxes on land within the village.

Notwithstanding the plain language of the statutory schemes, in an early case, our Supreme Court determined that a township does not lose territory as a result of the incorporation of a village. *Dearborn Twp*, 308 Mich at 296. The Court relied in significant part on the fact that the village's property could still be taxed by the township:

> The organization of the village of Dearborn prior to the date of issuing any of the bonds in suit did not result in detaching any of the township's territory, nor relieve the area within the village boundaries from its proportion of contingent liability on the special assessment bonds. In the sense which is controlling in the instant case, none of the township's territory was annexed by any municipality concerned in this litigation until the first incorporation of the city of Dearborn. Prior to that event the village area continued to be a part of the township and subject to assessment to meet township obligations. [*Id.*]

The Court noted that the City of Dearborn incorporated in 1927 using the territory constituting the village of Dearborn. *Id.* at 289. By holding that none of the township's territory was annexed by any municipality until the City of Dearborn incorporated in 1927, the Court impliedly held that the incorporation of a village as a city constitutes the taking of territory from the township that has the authority to tax the village—even when the boundaries have not changed. *Id.* at 296.

Unfortunately, our Supreme Court did not construe MCL 117.14 in its decision, and did not address the fact that the Legislature appeared to treat these municipalities as distinct territories in the statutory scheme; the Court simply assumed that a township's territory included any territory that it could tax, notwithstanding that the territory fell within a village's boundaries. In making the assumption, the Court relied on earlier decisions that did not involve the same statutory provision. See *id.* at 296, citing *Bray v Stewart*, 239 Mich 340, 344; 214 NW 193 (1927) (discussing which electors may vote on a proposed annexation), and *Village of DeWitt v Twp of DeWitt*, 248 Mich 483-484; 227 NW 787 (1929) (noting that the statute under

consideration made no provision for the division of assets and liabilities as between a township and a village arising from the incorporation of a village within a township). This Court has similarly assumed that a village's territory is also the territory of the township within which it is located. See *City of Saugatuck v Saugatuck Twp*, 157 Mich App 52, 56-58; 403 NW2d 100 (1987); *Petersburg v Summerfield Twp*, 41 Mich App 639, 641; 200 NW2d 788 (1972).

As Chelsea correctly notes, a township cannot levy taxes on the taxable property in a village that it otherwise has the authority to tax in order to meet its obligations under a contract with a county for the acquisition, improvement, enlargement, or extension of a sewage disposal system. See MCL 123.742(1) and (2). Thus, if this Court were to interpret MCL 117.14 to require Chelsea to assume Sylvan's liabilities in a proportion that includes that part of the former Village of Chelsea that was subject to taxation by Sylvan, it would in effect allow Sylvan to do indirectly under MCL 117.14 what it was directly prohibited from doing under MCL 123.742(2). Although we believe that the Legislature intended to treat the territory of a village as distinct from the township or townships in which the village lies for purposes of dividing assets and liabilities under MCL 117.14, we must construe that statute consistently with our Supreme Court's decision in *Dearborn Twp*. Even applying that decision, however, we agree that Sylvan cannot include the territory that was within Chelsea's village boundaries when determining the proportion of the liability for the bonds, if any, which Chelsea assumed when it incorporated as a home rule city.

Because our Supreme Court impliedly determined that the Legislature used the term "territory" in MCL 117.14 as essentially synonymous with land subject to taxation, we must give effect to that interpretation. Accordingly, for purposes of calculating the division of personal property and liabilities between a village and a township where the village incorporates as a home rule city, we hold that the home rule city has effectively "taken" from the township that portion of the village's territory that was subject to taxation by the township. *Dearborn Twp*, 308 Mich at 296. For purposes of dividing liabilities, however, we conclude that the proportionate share of the liabilities must be determined separately for each liability and must be determined by calculating the assessed valuation of the property that could *lawfully* be taxed to pay the liability. That is, applying the reasoning from *Dearborn Twp*, we hold that—for purposes of calculating the proportion of a particular liability that a new city must assume when it incorporates—a township may not include the assessed valuation of taxable property from any village that was incorporated into the city, if the township could not have lawfully levied a tax on that land to pay the liability at issue.

Applying the law to the facts of this case, Sylvan could not lawfully levy a tax on the real property in the former Village of Chelsea to pay its liabilities under the bonds at issue. See MCL 123.742(2). Consequently, it could not include any part of the former village of Chelsea's territory in calculating the proportion of the liability on that debt, which Chelsea assumed when it incorporated.

## III. CONCLUSION

The trial court erred when it applied the doctrines of res judicata and equitable estoppel to bar Sylvan's claim. Consequently, it erred when it granted Chelsea's motion for summary disposition on those grounds. It also erred when it denied Sylvan's motion for summary disposition of Chelsea's res judicata, equitable estoppel, and waiver defenses. The trial court did not, however, err when it denied Sylvan's motion for summary disposition of Chelsea's defenses premised on the passage of the period of limitations and laches. For these reasons, we reverse the trial court's decision, vacate its order granting summary disposition, and remand for further proceedings. On remand, the trial court shall enter an order providing that the proportion of the liability at issue that Chelsea must assume, if any, must be calculated without including any portion of the assessed taxable value of the land formerly encompassed by the Village of Chelsea and dismissing Chelsea's res judicata, equitable estoppel, and waiver defenses.

Reversed, vacated, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. None of the parties having prevailed in full, we order that none may tax costs. MCR 7.219(A).

/s/ Michael F. Gadola
/s/ Joel P. Hoekstra
/s/ Michael J. Kelly