*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

EMMANUEL APPIAH-KUBI,

       Plaintiff-Appellant,

and

STAVE STUDIO PRODUCTIONS LLC,

       Plaintiff,

v

TOM MANUS, 529 CROFTON LLC, MANUS
REALTY, INC., TEM PROPERTY
MANAGEMENT LLC, BILL MANUS, and
STATE FARM INSURANCE,

       Defendants-Appellees.

UNPUBLISHED
February 28, 2019

No. 341128
Kent Circuit Court
LC No. 16-009776-CZ

Before: METER, P.J., and SAWYER and CAMERON, JJ.

PER CURIAM.

In this landlord-tenant dispute, plaintiff, Emmanuel Appiah-Kubi,[1] appeals by right the trial court's orders dismissing his claims against defendants, Tom Manus, 529 Crofton, LLC, Manus Realty, Inc., TEM Property Management, LLC, Bill Manus, and State Farm, after each defendant moved for summary disposition. Because Appiah-Kubi has not identified any grounds for reversing the trial court's orders, we affirm.

---

[1] The parties stipulated to the dismissal of Stave Studio Productions, LLC, before the trial court, and it is not a party to this appeal.

## I. BASIC FACTS

In January 2014, Appiah-Kubi leased the home located at 529 Crofton S.W. in Grand Rapids, Michigan, from TEM Property Management, LLC. The lease ended on January 31, 2015. Tom Manus executed the agreement on behalf of TEM Property Management. Under a heading stating "Those responsible for the Property:" someone wrote "Tom Manus—member" and provided his contact information. Bill Manus was listed under "Additional Emergency Name(s)" along with his contact information, and he was identified as Tom Manus's brother.

The lease provided that it was for "residential purposes only," and the parties agreed that Appiah-Kubi would not run a business from the home. It also included a lead-based paint disclosure, which indicated that the house likely contained lead-based paints. Appiah-Kubi agreed that he would not scrape or sand or otherwise disturb any painted surface. Appiah-Kubi also agreed to follow the precautions stated in an EPA booklet on lead in the home that was provided to him.

In his answers to interrogatories submitted in district court, Tom Manus indicated that he was a sales associate with Manus Realty, Inc., and that he owned TEM Property Management. He stated that TEM Property Management managed about 10 properties for him or for limited liability companies that he owned. 529 Crofton was a limited liability company that owned the house at issue. Tom Manus was the sole member of that company.

Tom Manus averred that he received notice from Helen DeVos Children's Hospital that Appiah-Kubi's son had elevated lead in his blood on July 2, 2014. He stated that Appiah-Kubi left a message asking him to fix the lead problem on July 11, 2014. Tom Manus said he told Appiah-Kubi on July 11, 2014, that Appiah-Kubi would have to relocate in order for him to fix the problems, but Appiah-Kubi refused to relocate. Tom Manus responded by sending Appiah-Kubi a letter that stated: "Given your recent concerns about your son's lead level and given my concerns about your housekeeping per lease, consider this the 30 day notice for you and all occupants to vacate." Later that same month, Appiah-Kubi sent Tom Manus a letter indicating that he was withholding rent until Tom Manus made various repairs, which included the abatement of the lead paint in the home.

TEM Property Management sued to evict Appiah-Kubi in district court in August 2014, and again in February 2015. The landlord-tenant dispute settled in May 2016.

In October 2016, Appiah-Kubi and his business, Stave Studio Productions, sued Tom Manus, 529 Crofton, Manus Realty, TEM Property Management, Bill Manus, and State Farm. Appiah-Kubi appeared before the trial court on his own behalf. He alleged various claims against the parties arising from his lease of the property at issue.

In his second amended complaint, Appiah-Kubi alleged that he suffered harm as a result of lead poisoning and two falls down stairs. He repeatedly complained about the home's lead problem and faulty steps, but he also asserted that he was unhappy with the home's neighborhood, the electrical system, his neighbors, and the purported failure of his business as a result of his inability to run it from the home.

Appiah-Kubi asserted that State Farm could be liable for its failure to release all of the information about its coverage of the lead poisoning at issue. Specifically, he claimed that State Farm was concealing the whereabouts of the insurance policy covering TEM Property Management in 2014. Appiah-Kubi alleged that Tom Manus was liable for the lead in the house because he knew or should have known about the presence of lead paint and did not abate it. He also knew or should have known about the hazardous steps. He stated that 529 Crofton was liable because it owned the house. He stated that Manus Realty was liable because Tom Manus worked for Manus Realty and, therefore, it was responsible for Tom Manus's actions under the doctrine of respondeat superior. Appiah-Kubi indicated that Bill Manus was liable for Appiah-Kubi's injuries because Bill was listed as a responsible person on the lease. Appiah-Kubi wrote that TEM Property Management was responsible for his injuries because it managed the property.

Appiah-Kubi alleged several claims. He alleged claims of piercing the corporate veil, negligence, premises liability, fraud, violations of the Michigan Consumer Protection Act, various statutory violations, breach of contract and fiduciary obligation, nuisance, and statutory penalty interest for bad faith insurance practices. He did not, however, describe how any one defendant was liable under any particular claim. Finally, Appiah-Kubi asked for monetary damages "of not less than one million dollars."

The trial court eventually dismissed each claim after the various defendants moved for summary disposition.

Appiah-Kubi now appeals in this Court on his own behalf.

## II. SUMMARY DISPOSITION

### A. STANDARDS OF REVIEW

On appeal, Appiah-Kubi argues that the trial court erred in several respects when it granted the motions for summary disposition.[2] This Court reviews de novo a trial court's decision on a motion for summary disposition. *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009). This Court also reviews de novo whether the trial court properly applied the common law, *Conlin v Upton*, 313 Mich App 243, 254; 881 NW2d 511 (2015), and properly selected, interpreted, and applied the relevant statutes, *Sylvan Twp v City of Chelsea*, 313 Mich App 305, 316; 882 NW2d 545 (2015).

---

[2] Appiah-Kubi's brief on appeal was not entirely clear. He stated 14 different claims of error that, for the most part, appeared to challenge the propriety of the trial court's decisions to grant summary disposition. However, his discussion of the issues did not always correspond to his statement of the issues on appeal. We have limited our analysis to those issues that Appiah-Kubi actually discussed in the body of his brief on appeal. To the extent that he might have raised claims of error that were not discussed in the body of his brief, we conclude that those claims were abandoned on appeal. See *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

## B. CLAIMS AGAINST STATE FARM

This Court has already affirmed the trial court's decision to dismiss the claims against State Farm on State Farm's motion under MCR 7.211(C)(3). See *Appiah-Kubi v Tom Manus*, unpublished order of the Court of Appeals, entered June 6, 2018 (Docket No. 341128). Nevertheless, we note that Appiah-Kubi's claims against State Farm were patently meritless.

Before the trial court and on appeal, Appiah-Kubi asserted that State Farm engaged in conduct that amounted to the intentional infliction of emotional distress by failing to comply with discovery—more specifically, he stated that State Farm failed to turn over a copy of an insurance policy that purportedly covered TEM Property Management during the period within which Appiah-Kubi leased the home owned by 529 Crofton. State Farm repeatedly denied that there was such a policy.

In order to prove a claim of intentional infliction of emotional distress, Appiah-Kubi had to present evidence that State Farm's acts amounted to extreme and outrageous conduct. See *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 602; 374 NW2d 905 (1985). In response to State Farm's motion, Appiah-Kubi maintained that State Farm's repeated failure to comply with his discovery requests over a long period supported his claim; specifically, he argued that TEM Property Management must have had an insurance policy that covered its acts and omissions, and that policy likely did not exempt lead claims. So it was outrageous for State Farm not to disclose that policy, which it had a duty to do.

Even setting aside the evidence that State Farm issued no such policy to TEM Property Management for the relevant period, it was not enough for Appiah-Kubi to show that State Farm's failure to provide discovery was tortious or criminal, or even that State Farm intended to cause emotional distress. See *id*. Indeed, "insults, indignities, threats, annoyances, petty oppressions, or other trivialities" can never give rise to liability. *Id*. at 603 (quotation marks and citation omitted). Rather, the conduct must go "beyond all possible bounds of decency" so as to "be regarded as atrocious, and utterly intolerable in a civilized community." *Id*. (quotation marks and citation omitted). The failure to comply with discovery was not the kind of conduct that a reasonable jury could find amounted to extreme and outrageous conduct. *Id*. As such, the trial court could properly dismiss Appiah-Kubi's claim on the ground that no reasonable jury could find that State Farm's conduct met that standard. See *Moning v Alfono*, 400 Mich 425, 438; 254 NW2d 759 (1977) (recognizing that the specific standard of care and cause in fact are normally for the jury unless reasonable minds could not differ). Moreover, State Farm was entitled to insist on its legal rights and could properly refuse a discovery request that it felt did not comply with the rules. See *Roberts*, 422 Mich at 603 (recognizing that a party may insist on his or her legal rights and such insistence, even when otherwise extreme or outrageous, is privileged). As such, the trial court did not err when it dismissed Appiah-Kubi's intentional infliction of emotional distress claim against State Farm.

Appiah-Kubi also suggested that State Farm might be liable to him under MCL 500.2006(1), which provides that an insurer must timely pay claims and provides that the failure to do so "is an unfair trade practice unless the claim is reasonably in dispute." However, Appiah-Kubi did not present any evidence that he had a legally enforceable right to the payment of any benefits from State Farm. Therefore, he could not rely on that statute.

The trial court did not err when it dismissed Appiah-Kubi's claims against State Farm.

## C. CLAIMS AGAINST BILL MANUS

In order to hold Bill Manus liable for an act or omission involving Appiah-Kubi's lease of 529 Crofton, Appiah-Kubi had to establish that Bill Manus owed him a duty of care under the common law, statute, or contract. See *Hill v Sears, Roebuck & Co*, 492 Mich 651, 660-661; 822 NW2d 190 (2012). It was, however, undisputed that Bill Manus was not a party to the lease agreement and could not, for that reason, be bound by its terms. See *Huntington Nat'l Bank v Daniel J Aronoff Living Trust*, 305 Mich App 496, 508; 853 NW2d 481 (2014) (stating that the proponent of a contract bears the burden of proving that the parties mutually assented to the terms). There was also no evidence that he had an ownership interest in 529 Crofton or TEM Property Management, or otherwise had a common-law duty arising from his involvement with the property. See *Fultz v Union-Commerce Associates*, 470 Mich 460, 463; 683 NW2d 587 (2004) (stating that it was axiomatic that there can be no tort liability for an injury involving a condition on land unless the defendant owed the plaintiff a duty).

The only evidence that Bill Manus had anything to do with the lease involved in this case was a notation in the lease that Appiah-Kubi could contact Bill Manus as an emergency contact, which was placed under the heading, "Those responsible for the Property." That heading, in turn, was located after the signature line and in a section that provided contact information. The notation that Bill Manus was an emergency contact suggested—at best—that Appiah-Kubi could use Bill Manus as an alternate way of contacting a responsible person. It did not establish that he had contractual obligation under the lease or that he had an agency relationship with TEM Property Management or 529 Crofton. There was also no evidence that Bill Manus had agreed to act as an agent for either entity. See *Uniprop, Inc v Morganroth*, 260 Mich App 442, 445-446; 678 NW2d 638 (2004) (stating that the agent must agree to act in accordance with his principal's instructions to create an express agency agreement).

Appiah-Kubi nevertheless asserted that Bill Manus was an agent because Tom Manus gave the appearance that Bill Manus was an agent of some kind. The doctrine of apparent authority allows a plaintiff to show that a principal engaged in conduct that cloaked his or her agent with the apparent authority to act such that the *principal* should be held liable for the agent's acts or omissions; it does not serve to make a person who never agreed to be an agent liable for the acts or omissions of the ostensible principal. See *Central Wholesale Co v Sefa*, 351 Mich 17, 25-26; 87 NW2d 94 (1957) (discussing the general principles applicable to the doctrine of apparent authority). Consequently, even though Tom Manus listed Bill Manus as a contact person, and may even have told Appiah-Kubi to call Bill Manus, Tom Manus's actions did not obligate Bill Manus to assume any duties to Appiah-Kubi.

Appiah-Kubi also indicated that, had he been allowed to conduct discovery, he might have been able to show that Bill Manus had possession and control of the property at issue. Appiah-Kubi misapprehends the nature of the terms possession and control. Mere ownership does not give rise to a duty to maintain or repair property. See *Sholberg v Truman*, 496 Mich 1, 9; 852 NW2d 89 (2014). Rather, the key question is who has actual control and possession of the property. *Id.* at 10-11. If a tenant has occupied the premises and has the entire control thereof, the tenant is in possession and control. *Id.* at 11.

Once Appiah-Kubi signed the lease for the property at issue, he had the right to exclusive possession and control of the property as against even the owner, except to the extent that the owner retained any rights in the lease. See *Ann Arbor Tenants Union v YMCA*, 229 Mich App 431, 443; 581 NW2d 794 (1998). It was undisputed that Bill Manus did not own the property, did not have an ownership interest in an entity that owned or managed the property, and was not a party to the lease. Therefore, it was undisputed that he could not have had any right to possess or control the property in any capacity, and further discovery could not have demonstrated otherwise. See *Mackey v Dep't of Corrections*, 205 Mich App 330, 333; 517 NW2d 303 (1994) (stating that summary disposition is appropriate when there is no fair chance that further discovery will result in factual support for the party opposing the motion).

Appiah-Kubi failed to demonstrate that Bill Manus had any connection to him that might have given rise to a duty of care. Therefore, the trial court did not err when it dismissed Appiah-Kubi's claims against Bill Manus.

## D. CLAIMS AGAINST MANUS REALTY

Appiah-Kubi similarly failed to establish that Manus Realty owed him any duty. It was undisputed that Manus Realty did not own the property at issue, did not have an ownership interest in the entities that owned and managed the property at issue, and was not a party to the lease. Richard Manus averred that he owned Manus Realty, that Manus Realty was not affiliated with TEM Property Management or 529 Crofton, and that no one representing Manus Realty has ever been to the property owned by 529 Crofton or had contact with Appiah-Kubi. As such, Manus Realty did not owe Appiah-Kubi any contractual duties, see *Huntington Nat'l Bank*, 305 Mich App at 508, or any duties as the party in possession and control of the property at issue, See *Sholberg*, 496 Mich at 10-11. Appiah-Kubi claimed that Tom Manus was an owner of Manus Realty. But even if Tom Manus were an owner, that would not by itself establish that Manus Realty had any duty to Appiah-Kubi as the lessee of a property owned and managed by different entities. Michigan courts generally respect the separate existence of corporate entities from their owners. See *Green v Ziegelman*, 310 Mich App 436, 450-451; 873 NW2d 794 (2015). Thus, the fact that an owner may have done some act or committed some omission does not by itself render the entity liable.

Appiah-Kubi also suggests that Manus Realty could be responsible for any breach of duty by Tom Manus under the theory of respondeat superior. More specifically, Appiah-Kubi states that there was evidence that Tom Manus worked for Manus Realty, as shown on the company's website, that Tom Manus represented himself as a realtor with Manus Realty, and that Tom Manus showed him homes for lease during the hours of operation of Manus Realty. Our Supreme Court long ago explained that a principal cannot be liable for the acts or omissions of its agent unless the agent was acting within the scope of his or her employment, which means that the agent must have been acting in service of his or her master. See *Riley v Roach*, 168 Mich 294, 307-308; 134 NW 14 (1912); see also *Zsigo v Hurley Med Ctr*, 475 Mich 215, 226-227; 716 NW2d 220 (2006) (refusing to adopt an exception to the rule that an employer cannot be held liable for its employee's torts unless the employee is acting within the scope of his or her employment because that would amount to making the employer strictly liable for the conduct of its employees).

The undisputed evidence showed that Appiah-Kubi did not have any agreements with Manus Realty. Instead, Tom Manus showed Appiah-Kubi homes for lease that were owned by entities that Tom Manus owned. And Appiah-Kubi entered into a lease agreement with TEM Property Management to lease a home owned by 529 Crofton. All the evidence showed that Tom Manus acted as the agent for those entities and the fact that he might also have had some relationship to Manus Realty did not make Manus Realty liable for his actions while acting on behalf of a different entity. There was simply no evidence that Tom Manus was actually acting on behalf of Manus Realty; rather, the undisputed evidence showed that he was acting to accomplish his own purposes. See *Bryant v Brannen*, 180 Mich App 87, 98; 446 NW2d 847 (1989) (stating that courts may decide whether the agent was acting within the scope of his or her employment as a matter of law when the evidence shows that the agent was acting to further his or her own ends). Not only did Appiah-Kubi fail to present any evidence that Manus Realty directed Tom Manus's actions, he failed to present evidence that supported apparent authority. There was no evidence that Manus Realty took any actions that might have mislead a reasonable person to believe that Tom Manus was acting on behalf of Manus Realty when he showed the property at issue despite the fact that Manus Realty had no involvement with the property. See *Maretta v Peach*, 195 Mich App 695, 699; 491 NW2d 278 (1992) (stating that an agent's apparent authority must be traceable to the principal and cannot be established by the conduct of the purported agent). The evidence that Manus Realty listed Tom Manus on its website and listed its hours of operation was not sufficient to establish that Manus Realty mislead the general public into believing that Tom Manus was invariably acting on its behalf any time he took any action with regard to any property during normal business hours. See *id.*; see also *Niederhouse v Palmerton*, 300 Mich App 625, 633; 836 NW2d 176 (2013) (stating that the temporal boundaries of the employee-employer relationship is but one factor in determining whether the employee was acting in the course of his or her employment). No reasonable jury could find apparent authority on those facts. Consequently, Manus Realty could not be held liable for Tom Manus's acts or omissions as a matter of law. See *Maiden v Rozwood*, 461 Mich 109, 128; 597 NW2d 817 (1999) (stating that summary disposition was appropriate because, given the evidence before the trial court, reasonable minds could not differ on an essential element of the claim).

The undisputed evidence showed that Manus Realty had no relationship with the property at issue or Appiah-Kubi that imposed a duty of care on Manus Realty. The trial court did not err when it dismissed Appiah-Kubi's claims against Manus Realty.

## E. LEAD CLAIMS

Appiah-Kubi also challenges the trial court's decision to grant the motion for summary disposition of his claims premised on the existence of lead-based paint in the home. Before the trial court, Appiah-Kubi assumed that the existence of lead paint in a home automatically constituted a hazard that must be abated. But Appiah-Kubi cited no Michigan statute or common-law principle that imposes on real property owners a heightened duty to inspect or remediate buildings that have been painted or likely have been painted with lead-based paints. Indeed, Congress has recognized that the danger posed by lead-based paints can be reduced by simple preventative measures. See 42 USC 4851(6). For that reason, Congress requires landlords to provide lessees with a lead hazard information pamphlet. See 42 USC 4852d(1). The evidence showed that Tom Manus, while acting on behalf of TEM Property Management and 529 Crofton, provided Appiah-Kubi with that pamphlet. And the pamphlet provided

information on how a tenant, such as Appiah-Kubi, could safely occupy a home with lead-based paint.[3] Notably, Congress did not require a landlord to inspect or remediate lead-based paints in older housing. See 24 CFR 35.88(a) ("Nothing in this section implies a positive obligation on the seller or lessor to conduct any evaluation or reduction activities."); see also 40 CFR 745.107(a). Thus, the fact that Tom Manus knew or should have known that the property at issue contained lead-based paint, did not by itself establish any duty beyond providing the disclosure required under federal law. Instead, Appiah-Kubi had to establish that Tom Manus, TEM Property Management, and 529 Crofton had a duty to repair any hazard posed by the lead paint under ordinary common-law principles.

Traditionally, once a landlord leased a property to his or her tenant, the landlord ceased to have possession and control of the property and, for that reason, could not be liable for the failure to keep the property in a safe condition. See *Lipsitz v Schechter*, 377 Mich 685, 687-688; 142 NW2d 1 (1966). Our Supreme Court, however, overruled the older line of authorities and adopted the rule that a landlord can be held liable in tort for the failure to keep the property in safe repair even after the tenant takes possession, if the landlord agreed to keep the property in repair. See *Mobil Oil Corp v Thorn*, 401 Mich 306, 312-313; 258 NW2d 30 (1977) (adopting 2 Restatement Torts, 2d, § 357). And the Michigan Legislature has provided a continuing duty on landlords to maintain dwellings in reasonable repair as part of the lease agreement. See MCL 554.139; see also MCL 125.536. Nevertheless, the statutory duty to repair applies only to those hazards about which the landlord knew or should have known. See *Evans v VanKleek*, 110 Mich App 798, 803; 314 NW2d 846 (1981). And, notwithstanding the statutory duty to repair, a landlord has no duty to regularly inspect premises under the exclusive possession and control of his or her tenant. See *Raatikka v Jones*, 81 Mich App 428, 430-431; 265 NW2d 360 (1978). Rather, the landlord's duty to repair under the statute only applies when the tenant notifies the landlord of a defect or the landlord becomes aware of the defect upon a casual inspection. *Id.* at 431. Similarly, the common law of premises liability requires proof that the landlord had actual or constructive notice of the hazardous condition. See *Lowrey v LMPS & LMPJ*, 500 Mich 1, 9; 890 NW2d 344 (2016). Accordingly, as an essential element of his claims involving a lead-based paint hazard, Appiah-Kubi had to demonstrate that the person or entities responsible for keeping the home in reasonable repair knew about a specific lead-paint hazard.

As already noted, there is no statute or other Michigan law that treats all lead-based paint as a hazard that must be remediated without regard to the condition of the paint. Rather, under ordinary common-law principles, the duty to repair a lead-based paint hazard arises when the landlord is on notice, in relevant part, that the property has or likely has lead-based paint and the paint is in a deteriorated condition—that is, has begun to peel or chip. See, e.g., *Chapman v*

---

[3] Appiah-Kubi denied receiving the pamphlet, but his denial was conclusory, unsupported by plausibly admissible evidence, and directly contradicted by Tom Manus's averments and the lease agreement. A conclusory denial is insufficient to create a question of fact under these circumstances. See *SSC Assoc Ltd Partnership v Gen Retirement Sys of Detroit*, 192 Mich App 360, 364; 480 NW2d 275 (1991) (stating that a party may not establish a question of fact with opinions, conclusory denials, unsworn averments, or inadmissible hearsay).

*Silber*, 97 NY2d 9, 15, 21-23; 734 NYS2d 541; 760 NE2d 329 (2001) (declining to adopt a heightened common-law duty to inspect or remediate lead-based paint premised on the general knowledge that the building contains lead-based paint and instead holding that, under ordinary common-law principles, the plaintiff must show that the landlord retained the right of entry and assumed the duty to repair, that the landlord knew that the dwelling was built before the ban on lead paint, and that the landlord was aware that the paint had become deteriorated). Therefore, the trial court did not err to the extent that it determined that Tom Manus's general knowledge about the potential for lead-based paint in the home did not by itself make Tom Manus or his entities liable for any harm suffered by Appiah-Kubi or his family by exposure to lead-based paint before July 2014.

In this case, Tom Manus, TEM Property Management, and 529 Crofton presented evidence—pictures and an inspection report—that demonstrated that the residence at issue was in good condition just before Appiah-Kubi took possession of the home. They also presented copies of every complaint made to the City of Grand Rapids regarding the property over the years and none of the complaints involved lead. Tom Manus also averred that he never performed major renovations that disturbed painted surfaces. This evidence was sufficient to establish that Tom Manus and his entities had no notice of any flaking, peeling, or chipping lead-based paint hazards. Contrary to Appiah-Kubi's contention, the trial court could properly consider this evidence—even though the city's inspection did not test for lead—as evidence that Tom Manus and his entities were not aware of any deteriorated or damaged paint that could have exposed a future tenant to lead. See MCR 2.116(G)(5) (providing that the court must consider the evidence filed in support of a motion under MCR 2.116(C)(10)). It was also undisputed that Appiah-Kubi did not notify Tom Manus about the possibility of lead-based paint exposure of any kind until July 2014. Thus, the undisputed evidence showed that Tom Manus, while acting as the agent for TEM Property Management and 529 Crofton, had no notice of any specific lead-based paint hazard arising from damaged or deteriorated paint before July 2014. Consequently, the trial court did not err when it determined that Appiah-Kubi failed to establish a question of fact on the element of notice of a specific lead-based paint hazard.

Appiah-Kubi also maintains that the trial court erred when it considered the fact that the lease provided notice that the house may have had lead-based paint in it. Appiah-Kubi states that MCL 554.633, MCL 554.637, and MCL 554.139 prohibit a landlord from including a term in the lease that deprives the tenant of his or her remedies in a lease. Those statutes prohibit a landlord from including a provision in the lease that waives or alters the remedies that the tenant might have under the law. See MCL 554.633(1)(a) (prohibiting the inclusion of a provision in a rental agreement that waives or alters a remedy available to the tenant); MCL 554.637 (stating that the remedies available under the act are in addition to any other remedies provided by law); MCL 554.139 (providing that every lease of residential premises must include a covenant to keep the premises in reasonable repair). The provision of notice about the potential for lead-based paint in the home did not waive or alter any remedy under any statute or the common law arising from the landlord's failure to keep the home in repair. Appiah-Kubi retained his right to sue for an alleged violation of the statutory or common-law duties to maintain the home in reasonable repair, but he still had the obligation to establish a question of fact on each element of his claims.

Contrary to Appiah-Kubi's contention, those statutes also could not save his fraud claims. Appiah-Kubi claimed that Tom Manus assured him that the home did not have lead-based paint

before he entered into the lease agreement. But the lease specifically provided Appiah-Kubi with notice that the home likely contained lead-based paint, and Tom Manus and his entities presented evidence that Appiah-Kubi acknowledged receipt of the required federal pamphlet instructing homeowners about lead in homes. The lease also contained a merger clause. Given the evidence that Appiah-Kubi had notice of the lead in the lease, and even assuming that Tom Manus actually assured Appiah-Kubi that there was no lead-based paint in the home before they executed the lease, Appiah-Kubi could not reasonably rely on that representation because the merger clause made it unreasonable for Appiah-Kubi to rely on it as a matter of law. See *Hamade v Sunoco, Inc (R&M)*, 271 Mich App 145, 171; 721 NW2d 233 (2006). It was Appiah-Kubi's knowledge—as stated in the lease—that fatally undermined his fraud claim and not a term in the lease that purported to waive or modify Appiah-Kubi's right to sue.

Appiah-Kubi also failed to establish that the trial court erred in its assessment of causation. Causation is an element of every tort involving negligence. *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000).

Tom Manus, TEM Property Management, and 529 Crofton presented evidence that the home was in good condition before Appiah-Kubi took possession and control. They also presented evidence that Tom Manus did not have any previous notice of a defect in the painted surfaces and did not do anything to cause damage to the painted surfaces. They also demonstrated that Appiah-Kubi violated the terms of the lease by pounding nails into the walls, damaging walls, affixing things to the walls, and otherwise disturbing the painted surfaces of the home. They presented photos and averments that showed that Appiah-Kubi's changes caused fairly extensive damage to painted surfaces and took significant efforts to remediate. Tom Manus and his entities argued, on the basis of that evidence, that Appiah-Kubi's failure to abide by the terms of the lease was the sole cause of any exposure to lead, and that Appiah-Kubi would be unable to show that any act or omission by Tom Manus while acting on behalf of TEM Property Management or 529 Crofton caused his exposure to lead. The evidence presented by Tom Manus and his entities, if left unrebutted, would establish that Tom Manus and his entities did not cause damage to the painted surfaces that would have resulted in the release of lead into the home, but that Appiah-Kubi did cause damage to the painted surfaces that could have released lead into the home.[4] As such, Tom Manus and his entities properly supported their motion for summary disposition on the ground that Appiah-Kubi could not establish causation and, accordingly, the burden shifted to Appiah-Kubi to present evidence establishing a question of fact as to that element. See *Barnard Mfg*, 285 Mich App at 369-370.

Appiah-Kubi responded by presenting evidence that Tom Manus had in fact done some repairs that might have caused the exposure through extensive renovations. He cited Tom Manus's answers to interrogatories, which included a list of repairs that were made. He also indicated that Tom Manus gave him permission to make the changes that he made, that Tom

---

[4] Under MCL 554.139(1)(b), Tom Manus and his entities had no obligation to repair a condition of the premises "when the disrepair or violation of the applicable health or safety laws has been caused by the tenant[']s willful or irresponsible conduct or lack of conduct."

-10-

Manus failed to show that the changes that he made caused his lead exposure, and that the photos depicting the house before he moved in were old and provided false representations.

Appiah-Kubi's response did not establish that Tom Manus's acts or omissions were the potential cause of any lead exposure that he and his family may have suffered. The list of repairs for the most part involved repairs that Tom Manus made long before Appiah-Kubi moved into the home and the evidence that the house's painted surfaces were in good condition negated the possibility that those earlier repairs caused damage to the painted surfaces that posed an ongoing hazard. Further, although the earlier repairs might have released lead-based paint dust or chips into the home, the evidence that the home had been cleaned and prepared for leasing, had passed inspection, and that there had been no previous complaints about lead precluded an inference that those previous repairs caused any lead contamination in the home.

The list of repairs that Tom Manus performed during the tenancy at issue were minor and did not suggest that Tom Manus caused significant disturbances to the painted surfaces that might have released lead into the home. Tom Manus and his entities also supplemented the record with an affidavit to clarify that Appiah-Kubi was mischaracterizing Tom Manus's statements regarding the upgrades to the electrical system. In a supplemental affidavit submitted to the trial court, Tom Manus averred that he upgraded the electrical system by installing a larger electrical panel and installing two outlets that were 2 inches by 4 inches. He stated that he was a certified lead renovator and that he followed correct practices to limit the creation of lead exposure. He used a cutter, as opposed to a drill or saw, and collected the dust on a tarp. He then removed the tarp and vacuumed any residue.[5] Finally, even if Tom Manus gave Appiah-Kubi permission to cause the damage to the painted surfaces, that permission would not alter the fact that Appiah-Kubi caused any release of lead in the home occasioned by the damage. On this record, no reasonable jury could conclude that Tom Manus's acts or omissions proximately caused Appiah-Kubi's injuries. See *Maiden*, 461 Mich at 128 (stating that summary disposition is appropriate when, given the evidence, reasonable minds could not differ on an essential element); see also *Skinner v Square D Co*, 445 Mich 153, 174; 516 NW2d 475 (1994) (stating that summary disposition was appropriate because the plaintiff failed to present evidence that would support a reasonable inference of a logical sequence of cause and effect to establish proximate cause).

Appiah-Kubi also claims that the trial court erred when it used the evidence that Appiah-Kubi refused to move out after Tom Manus informed him that he was terminating the lease as further evidence that Appiah-Kubi was responsible for his own injuries. The trial court indicated that Appiah-Kubi failed to present any evidence that he had no choice but to stay in the home and failed to cite any authority allowing him to claim damages for harms that he might have sustained as a result of his decision to stay. Appiah-Kubi asserts on appeal that the trial court should have realized that he could not afford to move because there was evidence that Appiah-

---

[5] Appiah-Kubi accused Tom Manus of lying to the trial court about his lead certification. However, Tom Manus responded by providing the trial court with his certificate of completion of a course that complied with 40 CFR Part 745.225.

Kubi's wife filed for Medicaid on his behalf. However, he did not present any evidence that he had no viable alternative but to remain in the house. And the trial court was not obligated to search for evidence to establish Appiah-Kubi's position. See *Barnard Mfg*, 285 Mich App at 375-379. Further, the fact that he applied for Medicaid did not establish that Appiah- Kubi was incapable of finding alternate housing.

Appiah-Kubi failed to identify any errors warranting reversal of the trial court's decision to dismiss his claims premised on exposure to lead.

## F. DEFECTIVE STAIRS

Appiah-Kubi also argues that the trial court erred in various ways when it granted the motion to dismiss his claims premised on defective stairs, which he claimed caused him to fall twice. As already stated, once Appiah-Kubi took possession and control of the property, Tom Manus, TEM Property Management, and 529 Crofton had a limited ability to inspect the property. See *Raatikka*, 81 Mich App at 430-431. Thus, in order to have notice of a defective condition, Appiah-Kubi would have had to have provided notice of the defective condition. See See *Lowrey*, 500 Mich at 9; *Evans*, 110 Mich App at 803.

On appeal, Appiah-Kubi argues that Tom Manus and his entities have taken an inconsistent position with regard to any notice that they had concerning the defective steps. Appiah-Kubi relates that Tom Manus and his entities assert that he never gave them notice that the steps were defective, but they then concede that Tom Manus repaired the steps after Appiah-Kubi informed him of his first fall in January 2014. Appiah-Kubi's statement of the facts before the trial court is not accurate.

Before the trial court, Tom Manus and his entities presented evidence that Appiah-Kubi essentially conceded that he did not inform Tom Manus that he believed the steps were defective in any way until after his first fall in January 2014. They also presented Tom Manus's affidavit in which he averred that Appiah-Kubi did not inform him of any defect in the steps in January 2014. Absent notice, Tom Manus, TEM Management, and 529 Crofton could not be liable for any damages that Appiah-Kubi might have suffered in his first fall. See *id.*

Tom Manus also averred that Appiah-Kubi never told him that he fell down the stairs in either January or April 2014. He averred that Appiah-Kubi did call and report that two of the treads for the basement stairs near the top of the staircase were cracked. Tom Manus stated that he replaced the two treads, painted them, and coated them with silica sand like the other steps already had. These averments, if left unrebutted, established that Tom Manus did receive notice to repair two steps and that he repaired them after being given the notice. His statements also established that he performed a reasonable repair and did not receive any further notice that the steps were defective. Tom Manus and his entities also supplemented the evidence in support of their motion after the completion of Tom Manus's depositions. They noted that he testified that Appiah-Kubi did not inform him of any defects in the steps before his first alleged fall and did not inform him of any defect before Appiah-Kubi's alleged second fall.

In response to the motion for summary disposition on the ground that they lacked notice, Appiah-Kubi asserted that Tom Manus should have known about the defective steps because he

owned the property for years before Appiah-Kubi notified him of the defective treads. He also asserted that Tom Manus performed a defective repair because he used the same broken wood to repair the steps and just sprinkled sand on the stairs. The only evidence that Appiah-Kubi cited in support of his claims was a series of pictures of the steps and Tom Manus's list of repairs that he had performed. Appiah-Kubi did not, however, clarify when the pictures were taken or provide any context by which to evaluate the pictures and did not state how the list demonstrated that Tom Manus knew about a defective condition involving the stairs or performed a defective repair.

In order to hold Tom Manus or his entities liable for the second fall, Appiah-Kubi had to demonstrate that Tom Manus negligently performed the repair and that his negligence proximately caused Appiah-Kubi's fall, see *Moning*, 400 Mich at 437 (stating the elements of ordinary negligence), or that Tom Manus otherwise had knowledge of a defect in the stairs after the repair, see *Lowrey*, 500 Mich at 9; *Evans*, 110 Mich App at 803. Yet, Appiah-Kubi did not present any evidence that Tom Manus breached the applicable standard of care in making the repair, and he presented no evidence that he otherwise informed Tom Manus of the need for further repairs to the steps.[6] Under these circumstances, the trial court did not err when it dismissed Appiah-Kubi's claims premised on defective stairs. See *id.*

## G. FRAUD CLAIMS

Appiah-Kubi also argues that the trial court erred when it dismissed his fraud claims. Specifically, he maintains that the trial court failed to discuss the fact that Tom Manus committed fraud when he represented that the home could support his business and when he informed Appiah-Kubi that the home did not have lead.

Appiah-Kubi alleged that Tom Manus committed fraud when he falsely asserted that the home at issue was suitable for Appiah-Kubi's production business. He also claimed that Tom Manus fraudulently assured him that the home did not contain lead-based paint. It was, however, undisputed that the lease specifically prohibited Appiah-Kubi from operating a business from the home. The lease also notified Appiah-Kubi that the home likely contained lead-based paint and, for that reason, prohibited him from scraping or otherwise disturbing the painted surfaces. Finally, the lease contained a merger clause that provided that the terms and conditions governing the lease were contained within the lease agreement and that "there are no other or additional written or verbal agreements or understandings." The merger clause, when considered with the provisions prohibiting Appiah-Kubi from conducting a business and informing him of the potential lead-based paint, made it unreasonable for him to rely on any antecedent agreements or understandings concerning the terms of the lease as a matter of law. See *Hamade*, 271 Mich App at 171.

---

[6] Although Appiah-Kubi did not cite the evidence, there was an inspector's report from September 2014 in which the inspector noted that there were loose treads on the basement steps. The report did not establish how long the treads had been loose, whether the treads appeared to be recently repaired, and did not specify how the treads might have come loose.

The trial court did not err when it dismissed Appiah-Kubi's fraud claims premised on misrepresentations concerning the presence of lead-based paint on the property or the property's fitness for business purposes.

### III. SANCTIONS FOR FRIVOLOUS CLAIMS

Appiah-Kubi also claims that the trial court erred when it ordered him to pay costs and reasonable attorney fees as a sanction for filing frivolous claims. On appeal, Appiah-Kubi argues that the sanctions were inappropriate given that the trial court should not have granted the motions for summary disposition. As already stated, the trial court did not err when it granted those motions. In any event, by failing to offer any meaningful discussion of the facts or law, Appiah-Kubi has abandoned any claim that the trial court erred when it ordered him to pay sanctions. See *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

Affirmed. As the prevailing parties, defendants may tax costs. MCR 7.219(A).


/s/ Patrick M. Meter
/s/ David H. Sawyer
/s/ Thomas C. Cameron